UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CARL JOHNSON,<br>    Plaintiff, | :<br>:<br>: |
| v. | :   CIVIL ACTION NO. 3:10CV0175 (PCD) |
| STATE OF CONNECTICUT,<br>JUDICIAL BRANCH,<br>    Defendant. | :<br>:<br>:<br>: |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Carl Johnson, a current employee of the State of Connecticut, brings this action against his employer, State of Connecticut Judicial Branch. Plaintiff alleges that Defendant discriminated against him on the basis of his race in violation of Title VII and the Connecticut Fair Employment Act, General Statutes § 46a-60, when Defendant did not promote him from a temporary to a full-time position. Defendant moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on all counts of Plaintiff's Amended Complaint. For the reasons stated herein, Defendant's Motion for Summary Judgment [Doc. No. 29] is **denied**.

**I.    BACKGROUND**

The following allegations are set forth in Defendant's Rule 56(a)(1) Statement[1], Plaintiff's Rule 56(a)(2) Statement[2], and both parties' supplied depositions and exhibits. Because this case is at the summary judgment stage, this Court views the record in the light most

---

[1]     The allegations in Defendant's Rule 56(a)(1) Statement are admitted by Plaintiffs in their Rule 56(a)(1) Response, except as otherwise noted.

[2]     The allegations in Plaintiff's Rule 56(a)(2) Statement are admitted by Defendants in their Rule 56(a)(2) Reply, except as otherwise noted.

favorable to Plaintiff because he is the non-moving party. See Terry v. Ashcroft, 336 F.3d 138, 139 (2d Cir. 2003).

Plaintiff, an African American male, has been employed by Defendant, the State of Connecticut Judicial Branch, since 2002. (Def.'s Rule 56(a)(1) Stmt. ¶¶ 1; Am. Comp. ¶ 6.) Plaintiff alleges that in 2005, Mark Guasta ("Guasta"), Deputy Superintendent for Defendant, passed him over for a promotion on account of his race.

Plaintiff first acquired a job with Defendant after his retirement from the City of Hartford. (Am. Compl. ¶ 6.) He first interviewed with Defendant for a temporary Juvenile Detention Transportation Officer ("JTO") position. (Def.'s 56(a)(1) Stmt. ¶ 3.) Guasta, the interviewer, immediately liked Plaintiff, (Johnson Dep. 15:2-6, July 22, 2010), and subsequently hired him as a temporary JTO beginning on October 3, 2002. (Def.'s 56(a)(1) Stmt. ¶ 2.) Both temporary and full time JTOs transport juvenile detainees to and from court, detention centers, and medical appointments. (Pl.'s Mem. 3.) There are, however, substantial differences between the two position's benefits. For example, the temporary position is only a per diem job. (Def.'s 56(a)(1) Stmt. ¶ 5.) Thus, full time JTOs receive better compensation. (Pl.'s Rule 56(a)(2) Stmt. ¶ 5.) Unlike temporary JTOs, full time JTOs also have job security, seniority rights, sick time, vacation time, personal time and are unionized. (Pl.'s Resp. to Def.'s Rule 56(a)(1) Stmt. ¶ 9.) Therefore, Plaintiff did not have these benefits.

In 2005, Defendant offered Plaintiff a full time position as a Judicial Marshall. (Id. ¶ 35.) Although Plaintiff initially accepted the position, after two days of training, he became injured and was unable to complete the training. (Def.'s 56(a)(1) Stmt. ¶ 35.) At that point, because Plaintiff could no longer perform the requirements of the position, Defendant notified him that he

would not be able to hold the position. (Id. ¶ 36.) According to Plaintiff, Guasta was not involved in the Judicial Marshall hiring.[3] (Pl.'s Resp.¶ 35.)

### A. Defendant's Hiring Policies

Defendant maintains a manual "to provide guidance and assistance to those engaged in the hiring or promotion processes." (Pl.'s 56(a)(2) Stmt. Ex. 2, at 2.) For the hiring of a full-time JTO, the guidelines require each applicant be interviewed by a hiring panel composed of the direct supervisor for the position, an Affirmative Action Officer ("AAO") of the division, and a peer or equivalent of the position from outside the division. (Id.) According to Guasta, the AAO is supposed to "[e]nsure that the process is fair" and that each applicant is asked the same questions. (Guasta Dep. 52:4-6, July 27, 2010.) Prior to the interviews, the *entire* panel is supposed "to draft and/or review the questions, proposed answers, rating sheet, qualities and skills necessary to perform the job." (Pl.'s 56(a)(2) Stmt. ¶ 15.) When preparing the questions and answers, the panel is supposed to determine a range of answers "that will help to evaluate the candidates." (Pl.'s 56(a)(2) Stmt. Ex. 2, at 5.) Additionally, the panel is supposed to detail "corresponding desirable responses" to all of the questions. (Pl.'s 56(a)(2) Stmt. ¶ 18.) After interviewing the candidates, the panel must rank the candidates from best to worst. (Pl.'s 56(a)(2) Stmt. Ex. 2, at 3.)

Before ranking the candidates, however, the manual advises that the panel "should . . . . determine what further information needs to be added or confirmed in order to rank the

---

[3] The parties dispute whether Guasta encouraged Plaintiff to re-apply as a Judicial Marshall after he was discharged. Defendant's evidence suggests that Plaintiff could re-apply for the position, but there is no evidence to support Defendant's contention that Guasta was involved in that decision. (Def.'s Rule 56(a)(1) Stmt. Ex. J, at 1.)

candidates." (Pl.'s 56(a)(2) Stmt. Ex. 2, at 7.) The panel is "responsible for reviewing other sources of information about the top candidates' prior experience after the interview takes place." (Id.) If, at the time of the interview, the candidate is already employed by the Judicial Branch, then the "review would consist of an examination of performance appraisals and other documents contained in the employee's personnel file." (Id. at 7-8.) Once the hiring panel has compiled the rankings, it is supposed to recommend the desired candidates to the direct supervisor. (Id. at 3.)

### B. December Interview

In 2005, Defendant had three openings for full-time JTOs. (Def.'s 56(a)(1) Stmt. ¶ 10.) The posted job qualifications included: "knowledge of and ability to operate a motor vehicle to transport passengers, interpersonal skills, basic oral and written communication skills, ability to follow oral and written instructions" and also added that "one year experience would provide the knowledge, skill, and abilities listed above." (Id. ¶ 8.) Nine temporary JTOs, including Plaintiff, applied for the position. (Id. ¶ 10.)

At the time of the interview, Plaintiff had been employed as a per diem JTO longer than any of the other candidates. (Def.'s Reply ¶ 7.) Olardy Alicea ("Alicea"), Plaintiff's shift supervisor, felt Plaintiff was the strongest candidate because he knew the job better than anyone else. (Pl.'s 56(a)(2) Stmt. ¶ 24.) In fact, he knew it so well that Plaintiff states that he trained all of the other applicants. (Id. ¶ 28.) Alicea gave Plaintiff more challenging assignments because he believed Plaintiff could handle them. (Id. ¶ 27; Alicea Dep. 25:1-5, July 27, 2010.)

After the initial applicants were screened for the requisite qualifications, Defendant conducted interviews for the full time positions in December 2005. (Def.'s 56(a)(1) Stmt. ¶ 11.)

4

Pursuant to the hiring guidelines, Guasta assembled a hiring panel for the interviews. Guasta contends that he asked Alicea and an AAO to serve on the panel.[4] (Guasta Dep. 56:8-59:4.) Yet on the day of the interview, only Alicea attended. (Def.'s 56(a)(1) Stmt. ¶ 11.) Defendant asserts that the AAO[5] did not come because she had a family emergency and could not attend. (Id. ¶ 12.) Even though the interview could have been postponed, Guasta chose to hold the interviews without an AAO present. (Pl.'s 56(a)(2) Stmt. ¶ 21.)

After choosing Alicea to serve on the panel, Guaste told him he would have a say in deciding who was hired because Alicea was familiar with all of the candidates. (Id. ¶ 11.) As shift supervisor, Alicea oversees all of the per diem and full-time JTOs., including all nine applicants. (Id. ¶ 4.) He visits a different location every day and monitors the JTOs in their daily activities. (Id. ¶ 12.) Because of his extensive interaction, Alicea had an individual opinion of each applicant. (Id. ¶ 13.) He also interacted with the JTOs much more frequently than Guasta. (Id. ¶ 9.) Guasta's deposition suggests that he mostly saw the JTOs in the morning, though he sometimes visited the JTOs at the courthouse. (Guasta Dep. 57:1-18.)

Prior to the December interviews, Guasta prepared the questions without input from any other members of the hiring panel. (Pl.'s 56(a)(2) Stmt. ¶¶ 16-17.) He did not disclose ideal answers to each question with Alicea or the other panel members, (Id. ¶ 17), nor did the score sheets identify corresponding desirable answers to each question. (Pl.'s 56(a)(2) Stmt. Ex. 4, at

---

[4] Although the hiring guidelines state that a peer or equivalent of the position from outside the division should also serve on the hiring panel, it does not appear that a peer or equivalent was on the December or January hiring panels.

[5] The parties dispute the AAO's identity. In his deposition, Guasta identifies the AAO as Cheryl Dedek. (Guasta Dep. 59:5-7.) Plaintiff notes, however, that the HR Manager identified the AAO for the first interview as Julie Rooney. (Pl.'s Rule 56(a)(2) Stmt. Ex. 3, at 5.)

10.)  Further, Guasta did not decide prior to the interviews whether he would hire the three candidates with the best interview scores, or whether he would analyze the interview scores in conjunction with other criteria, such as work experience, seniority or a supervisor's recommendation.  (Guasta Dep. 77:23-78:3.)  The guidelines do not indicate how much weight to assign a candidate's interview score.  (Pl.'s 56(a)(2) Stmt. ¶ 35.)  Guasta could not recall whether he had hired purely based on interview score in any of his previous fifty to sixty hiring decisions, or whether he had considered other criteria.  (Id. ¶ 34.)

After the interviews, Guasta's top three interview scoring candidates were Catalina Perea ("Perea"), Jimmy Gomez ("Gomez"), and Tony Quiron ("Quiron").  (Pl.'s 56(a)(2) Stmt. Ex. 4, at 1-3.)  None are African American.  In contrast, Alicea's top three interview scorers were Perea, Gomez, and Plaintiff.  (Pl.'s 56(a)(2) ¶ 22.)  Based on his scoring and observation of the candidates' job performances, Alicea recommended that Defendant hire Plaintiff, Perea, and Taneika Daley ("Daley").  (Id.)  Guasta instead chose Perea, Gomez, and Quiron, the three candidates given the highest interview scores by him.  (Id. ¶ 37.)  Alicea and Guasta's combined interview scores ranked Plaintiff fourth.  (Id. ¶ 33.)  Even though he did not select them, Guasta acknowledged that Plaintiff and Daley were both "very, very good." (Guasta Dep. 76:16-18.)

After learning of Guasta's decision, Alicea disagreed, telling Guasta that Plaintiff was more qualified than any of the other applicants.  (Pl.'s 56(a)(2) ¶ 39.)  As stated, Defendant first hired Plaintiff on October 3, 2002.  (Pl.'s 56(a)(2) Stmt. Ex. 11, at 2.)  In comparison, Defendant first hired Gomez on March 24, 2005, Quiron on August 4, 2005, and Perea on June 24, 2004. (Id. at 1.)  Plaintiff had worked for three years and three months at the time of the interview, whereas Gomez had worked for nine months, Quiron had worked for four months, and Perea had

worked a year and six months. (Id.) Therefore, Plaintiff actually had worked longer as a temporary JTO than all three of the selected applicants combined.

Plaintiff contends that the entire interview process was subjective and standardless. (Am. Compl. ¶ 12.) The score sheets from the December interviews provide support for this contention. For instance, Guasta's individual scores for each of the answers provided by Joel Brooks ("Brooks"), an African American applicant, do not add up to Brooks' final score. (Pl.'s 56(a)(2) Stmt. Ex. 4, at 14.) Brooks' individual scores calculate to seventeen yet Guasta gave him a score of sixteen. (Id.) Further, unlike the score sheets for every other applicant, Plaintiff's score sheet only contains a total score, not individual scores for each answer. (Id. at 10.) Therefore, there is no record to support how Guasta even calculated that score.

Because an AAO was not present at the first interview in violation of the guidelines, Daley filed a complaint with Guasta's supervisor. (Pl.'s 56(a)(2) Stmt. ¶ 40.) Guasta's supervisor ordered Guasta to rescind the original job offers and to re-interview all of the candidates. (Id. ¶ 41.) For this reason, all of the original candidates were supposed to be in contention. (Id.)

### C. January Interview

In January 2006, Guasta re-interviewed the candidates with an AAO present. (Def.'s 56(a)(1) Stmt. ¶ 15.) The hiring panel for the January interview consisted of Guasta, Alicea, Julie Rooney ("Rooney"), and Leigh Julian ("Julian"). (Id. ¶ 16.) Rooney was the acting AAO and Julian was the Affirmative Action Program Manager. (Id.) Once again, Guasta drafted the interview questions himself. (Pl.'s 56(a)(2) Stmt. ¶ 44.) Guasta also did not discuss or provide the other members with desirable answers to the questions. (Id. ¶ 46.) In fact, Guasta admits that

7

"everybody was sort of scoring on their own based on what they thought the answers should be." (Guasta Dep. 87:14-16.)

The panel's cumulative interview scores ranked the candidates as follows: Quiron, Gomez, Brooks, Perea.[6] (Def.'s 56(a)(1) Stmt. Ex. H, at 1.) Guasta's scores, when considered alone, were identical to the panel's cumulative scores. (Id.) When considering only Guasta and Alicea's scores, the candidates ranked in the following order: Quiron, Gomez and Brooks tied for second, Perea. (Id.) If Guasta had hired his top three scorers like he did in the December interviews, Brooks would have been hired, not Perea. (Def.'s Reply ¶ 52.) But this did not occur. Instead, Guasta chose Quiron, Gomez, and Perea for the positions. (Pl.'s Resp. ¶ 18.) Neither Guasta, Alicea, nor Rooney ranked Perea in the top three. (Def.'s 56(a)(1) Stmt. Ex. H, at 1.) Guasta ranked her fourth, Alicea ranked her seventh, and Rooney ranked her fifth. (Id.) Only Julian had Perea in the top three, and her score was tied with Brooks. (Id.) Because Julian and Rooney attended the interviews in their capacities as affirmative action officers, their scores did not count towards the ultimate decision. (Def.'s 56(a)(1) Stmt. ¶ 17.)

Alicea, whose interview scores Defendant alleges were considered, disagreed with Guasta's decision and instead recommended that the positions be offered to Plaintiff, Perea, and Daley. (Pl.'s 56(a)(2) Stmt. ¶ 48.) Alicea ranked Plaintiff's interview score second whereas Guasta ranked Plaintiff's score seventh. (Def.'s 56(a)(1) Stmt. Ex. H, at 1.) Plaintiff scored better than both Perea and Gomez on Alicea's score sheet. (Id.)

---

[6] Unlike the December interviews, the score sheets for each interview were not provided with either parties' summary judgment papers, so the Court cannot analyze them.

Out of the nine applicants, four were African American. (Pl.'s 56(a)(2) Stmt. ¶ 62.) None were hired. (Id.) In fact, three out of the four African American applicants tied for last place in Guasta's interview scoring. (Id.) Quiron and Gomez are multi-racial and Perea is Hispanic. (Def's 56(a)(1) Stmt. ¶ 17.)

Regarding Defendant's failure to promote Brooks, who had the third-highest score according to the cumulative score and Guasta's individual score, Defendant contends that Guasta coached Brooks for his second interview so it would have been unfair to hire him when other candidates did not receive similar interview coaching. (Def.'s 56(a)(1) Stmt. ¶ 24.) Yet Guasta did not inform the rest of the hiring panel, or a single Human Resources employee, that this coaching occurred prior to the interviews. (Pl.'s 56(a)(2) Stmt. ¶ 58-59.) Brooks also denies that the coaching session took place. (Id. ¶ 56.) Plaintiff suggests that if Guasta coached Brooks, he should have recused himself from the panel or at least informed Human Resources beforehand. (Pl.'s Mem. 11.)

Based on his belief that race played a factor in Defendant's failure to promote him, Plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC"). (Am. Compl. ¶ 3.) The complaint alleged discriminatory denial of promotion based on race. (Id.) Subsequently, the EEOC and CHRO issued Right to Sue letters for the Plaintiff. (Id. ¶¶ 4-5.) On February 8, 2010, Plaintiff filed his Amended Complaint, which asserts the following claims: discriminatory denial of promotion on the basis of Plaintiff's race, pursuant to Conn. Gen. Stat. § 46a-60 (Count One) and Title VII (Count Two). On January 18, 2011, Defendant moved for summary judgment on both counts of Plaintiff's Amended Complaint.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Importantly, however, "[c]onclusory allegations will not suffice to create a genuine issue." Delaware & Hudson Railway Co. v. Consolidated Rail Corp., 902 F.2d 174, 178 (2d Cir.1990). In an employment discrimination case, "a trial court must be cautious about granting summary judgment to an employer when . . . its intent is at issue." Gallo v. Prudential Residential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir 1994).

## III. DISCUSSION

Plaintiff asserts that Defendant did not promote him in violation of Title VII and the Connecticut Fair Employment Act. "The intent of the Connecticut legislature in adopting the CFEPA was to make the statute coextensive with Title VII; therefore, Connecticut courts look to federal case law for guidance in interpreting this provision of the CFEPA." John v. Bridgeport Bd. of Educ., 09-CV-378 (VLB), 2011 WL 1106708, at *17 (D. Conn. May 22, 2011) (citing

State v. Comm'n on Human Rights and Opportunities, 559 A.2d 1120, 1124 (1989)). Therefore, this Court will analyze the Title VII claim and the CFEPA claim simultaneously.

Plaintiff's discrimination claims are analyzed under the McDonnell Douglas three-step burden shifting framework.

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

### A. Prima Facie Case

To establish a prima facie case, Plaintiff must show "(1) that plaintiff falls within the protected group, (2) that plaintiff applied for a position for which he was qualified, (3) that plaintiff was subject to an adverse employment decision and (4) that the adverse employment decision was made under circumstances giving rise to an inference of unlawful discrimination." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 101 (2d Cir. 2001). Plaintiff has established the first three elements of a prima facie case. First, as an African-American, Plaintiff belongs to a protected class. Second, Plaintiff was pre-screened and received an interview because he had the requisite qualifications. Third, Plaintiff suffered the adverse employment action of being denied a promotion. Defendant, however, disputes whether Plaintiff has satisfied the fourth prong, whether the circumstances regarding its failure to promote Plaintiff gives rise to an inference of discrimination based on his race.

Plaintiff's burden in showing an inference of discrimination is *de minimis*. See Spell v. Connecticut, Office of Chief State's Attorney, 602 F. Supp. 2d 387, 394 (D. Conn. 2009). A rational trier of fact need only to be able to infer that the decision was based *in part* on discrimination. See Stern v. Trs. of Columbia Univ. in City of New York, 131 F.3d 305, 313 (2d Cir. 1997). Courts do not require direct evidence. See Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994). This is because "in 'reality. . . direct evidence of discrimination is difficult to find precisely because its practitioner deliberately try to hide it. Employers of a mind to act contrary to law seldom note such a motive in their employee's personnel dossier." Id. (quoting Dister v. Continental Group, Inc., 859 F.2d 1108, 1112 (2d Cir. 1988)). Therefore, the admissible evidence need only be sufficient enough to permit a jury "to infer a discriminatory motive." Chambers, 43 F.3d at 38. This includes circumstantial evidence. See id. at 37.

Evidence that a person outside of Plaintiff's protected class was offered the desired position is sufficient for a jury to infer a discriminatory motive. Rosso v. Pi Mgmt. Assocs., LLC., No. 02 Civ. 1702 (KNF), 2005 WL 3535060, at *17 (S.D.N.Y. Dec. 23, 2005); see also Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001) ("The mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination. . ."); see also Chambers, 43 F.3d at 39 (noting that the more favorable treatment of people not in the protected group could give rise to an inference); de la Cruz v. N.Y.C. Human Res. Admin. Dept. of Soc. Servs., 82 F.3d 16, 20 (2d Cir. 1996) (finding that the fourth prong was established when a black female replaced a Puerto Rican male).

Here, there is evidence that would allow a rational trier of fact to find circumstances that give rise to an inference of discrimination. Defendant did not promote any of the four African

12

American candidates. In doing so, Defendant passed over the most experienced applicant and the second highest scoring applicant according to Guasta and the entire interview panel. Instead, Defendant promoted three applicants outside of Plaintiff's protected class.

In arguing that Plaintiff has failed to establish an inference of discrimination, Defendant presents two arguments: (1) that Guasta has hired African Americans for the position in the past and (2) that he filled the full time JTO position with candidates from other underrepresented groups. This Court does not find either argument to be persuasive.

Defendant's past actions in hiring African Americans does not eliminate the possibility that race was a motivating factor in *this* hiring. Defendant has not provided any evidence of the previous hirings' circumstances or Guasta's involvement in those hirings. Without evidence of the past hirings' circumstances, this Court cannot place any weight on Defendant's argument regarding past African American hirings. However, even if such evidence proved favorable to Defendant, "an employer may not escape liability for discriminating against a given employee on the basis of race simply because it can prove it treated other members of the employee's group favorably." Graham v. Long Island R.R., 230 F.3d 34, 43 (2d Cir. 2000). Title VII is intended to protect individuals and not a class as a whole. Id.

Second, the fact that Defendant hired candidates from other underrepresented groups does not eliminate the possibility that there was bias against Plaintiff's protected class. A jury could find that Defendant looks more favorably upon Hispanic applicants than African Americans.[7] Accordingly, a reasonable fact finder could still find that in this circumstance, race played a

---

[7] The panel actually believed that Quiron was Caucasian. (Def.'s Mem. Ex F., at 1.) Thus a jury could also find that Guasta believed he was hiring a Caucasian and not a Hispanic candidate.

motivating factor in the full-time JTO hiring. In sum, the fact that four African American candidates were interviewed, one African American scored in the top three interviewees, two African Americans had more on the job experience than the other candidates and were recommended by their shift supervisor, and no African American was chosen is more than sufficient to establish an inference of discrimination.

B.      Defendant's Non-Discriminatory Reason

Once a plaintiff presents his prima facie case, the court will then consider whether the defendant has articulated a nondiscriminatory reason for not hiring him. See Chambers, 43 F.3d at 38. "Because establishment of the prima facie case creates an inference that the employer unlawfully discriminated against the employee, the burden then falls upon the employer to produce evidence that the employee was discharged for a legitimate, nondiscriminatory reason." Meiri v. Dacon, 759 F.2d 989, 996 (2d Cir. 1985). The reason must be clearly articulated and specific. Id.

Defendant offers a non-discriminatory reason for promoting the three applicants over Plaintiff and other African Americans: Defendant claims that the promotional decisions were based entirely on interview scores and Plaintiff was not selected because he scored lower than the other applicants on his interview. (Def's Mem. 10.) This reasoning, however, was not applied consistently. Brooks, who is African American and scored in the top three interviewees, was not promoted. Guasta asserts that this is because he coached Brooks for the interview and felt it would be unfair to promote someone who had that advantage. Aside from Guasta's testimony, there is no evidence to support this point, and Brooks denied that the coaching occurred.

C.   **Pretext**

Assuming Defendant's non-discriminatory reason is legitimate, however, under the McDonnell Douglas burden-shifting framework, Plaintiff must then show that the reason is a pretext for discrimination. Pretext can be established either directly by showing "that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Weiss v. JPMorgan Chase & Co., 332 F. App'x. 659, 661 (2d Cir. 2009) (quoting Tx. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)). In this case, Defendant's subjective interview process, its deviation from its own hiring standards, and its decision to select applicants with considerably less experience than Plaintiff all support a finding of pretext.

The Second Circuit has cautioned that "an employer may not use wholly subjective and unarticulated standards to judge employee performance for purposes of promotion." Knight v. Nassau Cnty. Civil Serv. Comm'n, 649 F.2d 157, 161 (2d Cir. 1981). If subjective evaluations were not scrutinized, a defendant would likely always respond "with a claim of some subjective preference or prerogative" and consequently likely always prevail. Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1040 (2d Cir. 1979). Employers can use subjective evaluations when making hiring decisions, but an employee is also allowed to challenge the evaluation's credibility. Byrnie, 243 F.3d at 105 (finding that other evidence, such as an applicant's strong qualifications and recommendations, supported the contention that age might have played a role in the employee's subjective evaluation).

In this case, the undisputed evidence suggests that Defendant's interview process was subjective and arbitrary. Guasta did not articulate a scoring process — such as the ideal answer or answers to each question — before the interviews. Nor did he indicate whether other criteria would be considered in conjunction with interview scores when picking the successful applicants. Only *after* Guasta had all of the applicant's scores did he decide to take the top three scoring candidates. During the December interview, there were not any African Americans in the top three. But, when an African American scored in the top three in the January interview, Guasta chose the fourth place scorer, who was not African American, for the promotion. The parties dispute whether Guasta had a legitimate reason for bypassing the third place scorer. Defendant's highly subjective interview scoring process, coupled with the circumstances surrounding Defendant's decision not to promote the third place scorer, raise serious questions regarding whether Defendant's promotion decisions were based in part on race.

In addition to Defendant's subjective interview process, this Court also finds that Defendant's deviation from its own hiring standards support a finding of pretext. A "departure from procedural regularity. . . can raise a question as to the good faith of the process where the departure may reasonably affect the decision." Stern, 131 F.3d at 317 (quoting Zahorik v. Cornell Univ., 729 F.2d 85, 93 (2d Cir. 1984)). When an employer disregards guidelines, it can provide "evidence of pretext and discriminatory intent." Richards v. N.Y.C. Bd. of Educ., 668 F. Supp. 259, 266 (S.D.N.Y. 1987); see also Hawkins v. Astor Home for Children, 96 CIV. 8778 (SS), 1998 WL 142134, at *7 (S.D.N.Y. Mar. 25, 1998) (finding that, while a departure from procedure will not prove pretext alone, it does "[strengthen] other evidence that was already pointing in the direction of discrimination"). Departure from an employer's affirmative action

guidelines can be especially telling when showing pretext.  Bd. of Educ. of City of Norwalk v. Comm'n on Human Rights & Opportunities, 832 A.2d 660, 671 (2003).

Here, there was a clear deviation from Defendant's own hiring guidelines.  Guasta did not have an AAO at the December interviews, did not share his questions with the rest of the panel prior to either the December of January interviews, and did not detail desirable answers for each corresponding question.  These are all violations of Defendant's hiring guidelines.  In addition, Defendant chose to ignore the guidelines' suggestion that the hiring panel consider other information, such as the applicants' personnel files, performance appraisals, and requisite experience.  By choosing to rely purely on his own interview scores and ignore any other information regarding the applicants, Guasta chose two candidates who did not even have the required one year of experience as set forth in the job posting.

Defendant responds that these guidelines are not mandatory.  (Def.'s Reply to Opp. to Mot. for Sum. J. 1.)  However, according to Guasta, he only contacted Human Resources for an AAO to be at his interviews because "policy required [him] to have somebody."  (Guasta Dep. 59:8-2.)  This statement suggests that supervisors considered the guidelines to be mandatory.

The fact that Defendant did not consider Plaintiff's significant experience, especially when the guidelines advise that performance appraisals and prior experience should be considered in conjunction with the interview, also supports a finding of pretext.  A "stark disparity" between a more experienced applicant and less experienced hiree can lead a jury to find that the employer's rationale is pretextual.  Weiss, 332 F. App'x. at 663; see also Holt v. KMI-Cont'l, Inc., 95 F.3d 123, 130 (2d Cir. 1996) (finding pretext when a person with superior

qualifications was passed over for someone with less experience).  Both parties acknowledge that Plaintiff had served as a per diem JTO far longer than any other candidate and that his shift supervisor strongly recommended him for the promotion.  At the time of the interview, Quiron had only been employed for nine months and Gomez had been employed for four months, while Plaintiff had been employed as a temporary JTO for three years and three months.  According to Defendant's job posting, which listed one year of experience as a temporary JTO as a qualification for the full time JTO position, Quiron and Gomez should not have even been interviewed.  Given that Plaintiff had significantly more experience than the other applicants and was recommended for the promotion by his supervisor, a question of fact exists as to whether Defendant's reason not to promote him was pretextual.

In arguing that Plaintiff cannot show pretext, Defendant asserts that this Court should apply the "same actor" inference.  The "same actor" inference states that when the same person hired and chose not to promote the plaintiff, there should be an inference against discrimination.  This inference is "permissive, not mandatory."  Memnon v. Clifford Chance US, LLP, 667 F. Supp. 2d 334, 351 (S.D.N.Y. 2009).  Although Guaste made the decisions to hire Plaintiff and pass him over for promotion, the Court is not persuaded that the inference applies here.  In a failure to promote case, "an employer may be willing to hire a member of a protected class, but unwilling to promote that person because of her protected status."  Harris v. City of New York, 03 CIV.6167 DLC, 2004 WL 2943101, at *4 (S.D.N.Y. Dec. 21, 2004).  Here, due to the disparity in benefits between a full time JTO position and a per diem JTO position, a jury could find that a supervisor would be willing to hire a member of the protected class for the per diem

position, but refuse to promote him to a position that includes a higher salary, job security and benefits.

## IV. CONCLUSION

A genuine issue of material fact exists as to whether Plaintiff's race was a motivating factor in Defendant's failure to promote him. Therefore, this Court is precluded from granting summary judgment. For the aforementioned reasons, Defendants' Motion for Summary Judgment [Doc. No. 29] is **denied.**

SO ORDERED.

Dated at New Haven, Connecticut, July  19 , 2011.

/s/
Peter C. Dorsey, U.S. District Judge
United States District Court